STATE OF MAINE
PENOBSCOT, ss

REUBEN GIVENS,
          Petitioner,

v.

MAINE DEPARTMENT OF
CORRECTIONS
          Respondent.

SUPERIOR COURT
CIVIL ACTION
Docket No. AP-18-0005

**ORDER DENYING PETITIONER'S 80C
APPEAL OF FINAL AGENCY ACTION**

Before the court is Petitioner Reuben Givens' petition for review of final agency action

brought pursuant to M. R. Civ. P. 80C. Mr. Givens' petition challenges the decision of the

Commissioner of the Maine Department of Corrections (D.O.C.) denying his grievance appeal[1]. A

hearing was held on October 16, 2019, during which the court heard arguments from both parties.

For the reasons below, the court affirms the Commissioner's decision and denies Mr. Givens'

petition.

I.      **Background**

In 2012, Mr. Givens was formally charged by the District Attorney's office of Atlanta,

Georgia with a rape offense. Although it appeared that probable cause existed for the offense, the

Georgia District Attorney declined to prosecute the case. Mr. Givens is currently incarcerated at the

---

[1] This matter has had a rocky procedural history. Mr. Givens first filed a "classification appeal" with the
D.O.C., but this appeal was not appropriate because Mr. Givens was already classified as minimum security.
Thereafter, he filed a grievance with the D.O.C., but the D.O.C. dismissed the grievance. Mr. Givens then
filed with the Court. Once the Attorney General's Office became involved, the Assistant Attorney General
asserted that the D.O.C.'s dismissal of Mr. Givens' grievance was not appropriate as the "grievance process"
was the appropriate process to address the issue in question. The Court granted the State's Motion to
Remand, over objection. Thereafter, the D.O.C. heard Mr. Givens' grievance. Ultimately, on April 26, 2019,
the D.O.C. Commissioner denied the grievance appeal. Mr. Givens then proceeded with this 80C review
proceeding.

Maine State Prison for a non-sex related crime and is housed in a medium security facility. At the time of the grievance at issue in this case, the Maine D.O.C. had a policy which stated that adult prisoners who are formally charged but not convicted of a sex offense may not be considered for transfer to a minimum-security facility unless the prisoner has completed the intensive phase of a D.O.C. residential sex offender treatment program. State of Me. D.O.C. Policy No. 23.1 (G)(7) (2017).[2] Mr. Givens contends that under this policy he was (1) wrongfully labelled as a sex-offender by the D.O.C.; (2) effectively forced to complete a sex-offender treatment program in order to earn "good time credits" and be considered for transfer to a minimum security facility; (3) suffered harm from being labelled as a sex-offender on account of stigma associated with the label; and (4) wrongfully denied transfer to a minimum security facility after he completed the treatment program.

Mr. Givens began participating in the sex-offender program in 2017 and completed the program sometime in March, 2018. On March 13, 2018, Mr. Givens filed a petition for judicial review under M. R. Civ. P. 80C challenging the D.O.C policy which required him to participate in the sex offender treatment program before he could be considered for transfer to a minimum-security facility. Mr. Givens' petition asserted that the D.O.C.'s policy violated his constitutional rights because it effectively compelled him to attend the sex-offender treatment program in order to earn certain "good-time" credits and obtain transfer to a minimum-security facility. He further asserted that the D.O.C. wrongfully labelled him as a sex-offender, as he was never convicted of a

---

[2] The policy stated in pertinent part:

> . . ., any prisoner who has been convicted or formally charged as an adult with any sex offense may not be transferred to a minimum-security facility unless the prisoner, if male, has completed the intensive phase of a Department residential sex-offender treatment program . . . A prisoner who meets all eligibility requirements for and is approved for transfer to a minimum-security facility may only be transferred to a minimum-security facility approved by the Department's Director of Classification for the treatment of sex offenders.

State of Me. D.O.C. Policy No. 23.1 (G)(7) (2017).

sex-offense, and that by labelling him as a sex-offender the D.O.C. caused him to be targeted for abuse by other prisoners and otherwise subjected him to stigma.

This court's order on July 27, 2018 remanded Mr. Givens' original petition to the D.O.C. for further proceedings through the D.O.C.'s administrative grievance process. Thereafter, Mr. Givens filed a grievance on August 8, 2018 with the D.O.C.'s grievance review officer. This is the grievance currently at issue in Mr. Givens' 80C petition before the court.

Mr. Givens grieved that the D.O.C. had wrongfully classified him as a sex-offender and placed him in sex offender programming. He wrote that his life has been put at risk because of this improper label and that he was told by D.O.C. staff that if he did not do the treatment program he would the lose "good-time" credits he had accumulated for the length of the program. He also grieved that since completing the program he was still being denied work release even though he currently had a minimum-security classification. He further asserted that labelling him as a sex-offender when he has not been convicted of a sex offense is a violation of his constitutional right to a fair trial and compelling him to attend with a threat of loss of "good-time" earned in the program is a violation of his due process rights.

Eventually, the grievance reached the Commissioner of the Department, the highest level of administrative review in the D.O.C. grievance process. As part of his grievance appeal, Mr. Givens submitted a letter to the Commissioner stating that: 1) although he had completed the sex offender program he was still not being allowed placement within a minimum-security facility; 2) he is not a sex offender; and 3) he has been harmed because of classification as a sex-offender and participation in the program.

The Commissioner denied Mr. Givens' grievance on April 26, 2019. The Commissioner stated that the reason for D.O.C. policy 23.1 (G)(7) (2017) was public safety. The Commissioner explained that minimum security housing is unfenced and thus allows greater opportunity for

3

prisoners to escape into the community and commit crimes. The Commissioner further commented that sex offenders tend to be repeat offenders and it is not uncommon for sex-offense crimes to go undetected. Thus, when there is an indication that a prisoner is a sex-offender, such as in Mr. Givens' situation where a formal charge was brought against him, the D.O.C. requires completion of a sex offender treatment program to reduce the risk of reoffending "before placing the prisoner in a situation where there is a greater opportunity to reoffend." The Commissioner further explained that the D.O.C.'s policy regarding work release and sex offenders is similarly based on public safety and that the D.O.C. "is unwilling to take a chance with public safety by having an untreated sex offender out on work release." Lastly, the Commissioner explained that although Mr. Givens had completed the sex offender treatment program he was no longer classified as minimum custody, a prerequisite for any prisoner to be considered for transfer to a minimum-security prison and for work release privileges. The Commissioner then noted that Mr. Givens was classified as medium custody by the D.O.C.'s Assistant Director of Classification because of two disciplinary violations.[3]

The D.O.C. responds to Mr. Givens' petition by arguing that Policy 23.1(G)(7) is based on public safety concerns and legitimate penological interests. Contrary to Mr. Givens' assertion, the D.O.C. argues that it did not compel his participation in the sex-offender treatment program as he was able to refuse to participate in the program and would not have been deprived of "good-time" credit that he had already earned outside of the program if he refused. The D.O.C. merely afforded him the opportunity to earn additional "good-time" credits by participating in the program. The D.O.C. further argues that it has significant discretion and ultimate authority on where to house a

---

[3] At the October 16, 2019 hearing, Mr. Givens stated that one of the disciplinary violations arose from an incident where another prisoner verbally assaulted and spat on him for being a sex-offender, and Mr. Givens stated that he defended himself from the other prisoner. Mr. Givens stated that the second disciplinary violation involved a violation of the prison's phone rules. The record does not provide other information on these disciplinary violations, other than that they occurred sometime after Mr. Givens began participating in the sex-offender program.

prisoner and whether to transfer a prisoner to another facility and that Mr. Givens' custody status was only one-factor relevant to its determination on whether to house him in a medium security or minimum-security facility. Lastly, the D.O.C. notes that participation in a work-release program is a privilege and that it is within the D.O.C.'s discretion to require a prisoner who has been formally charged with a sex offense to participate in a sex offender treatment program before being considered for such a privilege.

Mr. Givens argues that the D.O.C. has classified him as a sex offender by relying on charges for which he was never convicted and that this classification deprives him of a liberty interest protected by the due process clause. He contends that the classification constitutes a deprivation of liberty because it affects his ability to earn "good-time" credits by subjecting prisoners to a mandatory intrusive therapy program. He states that prisoners who are classified as sex offenders and required to participate in the program will not earn "good-time" credits for the length of the six-month program unless they participate because these prisoners necessarily receive monthly 'poor performance reports' due to non-participation in the program. Mr. Givens argues that this loss of "good-time" renders the program mandatory. In addition, he contends that prisoners who are classified as sex-offenders are barred from minimum custody facilities and work-release privileges unless they complete the program. Mr. Givens further argues that D.O.C. policy 23.1(G)(7) violates the Equal Protection Clause of the Fourteenth Amendment; and the Fifth Amendment.

At the October 16, 2019 hearing, Mr. Givens told the court that his life has been put at risk because of his classification as a sex-offender and participation in the sex-offender program. He also stated that his family life has been harmed because of his classification as a sex-offender and his participation in the sex-offender program. He stated that members of his family are now refusing to communicate with him and believe that he is a sex-offender. Mr. Givens told the court that his family learned of his participation in the sex-offender program after he disclosed the information to

5

them himself. The D.O.C. responded by stating it has a confidentiality policy that protects the information of prisoners in the program and that the D.O.C. did not disclose information about Mr. Givens' participation in the sex-offender program to members of his family.

## II.      Standard of Review

When called on to review a final agency action under M. R. Civ. P. 80C, the court reviews the administrative agency's decision for errors of law, abuse of discretion, or findings that are not supported by substantial evidence in the record. *Somerset Cty. v. Dep't of Corr.*, 2016 ME 33, ¶ 14, 133 A.3d 1006; *Dyer v. Superintendent of Ins.*, 2013 ME 61, ¶ 14, 69 A.3d 416 (the court defers to an agency's findings if supported by substantial evidence in the record even if the record contains inconsistent or contrary evidence.) "Substantial evidence" is defined as "such relevant evidence as a reasonable mind might accept as adequate to support the resultant conclusion." *Lewiston Daily Sun v. Me. Unemployment Ins. Comm'n*, 1999 ME 90, ¶ 7, 733 A.2d 344. The court examines the entire record to determine whether the agency could fairly and reasonably find the fact as it did. *Dyer*, 2013 ME 61, ¶ 14, 69 A.3d 416.

The court reviews issues of law de novo but "an agency's interpretation of its own internal rules will be given considerable deference and will not be set aside unless the rule plainly compels a contrary result, or the rule interpretation is contrary to the governing statute." *Friends of the Boundary Mountains v. Land Use Regulation Comm'n*, 2012 ME 53, ¶ 6, 40 A.3d 947. The party seeking to vacate the agency's decision bears the burden of persuasion and the agency's decision will only be vacated if the record plainly compels a contrary result. *Rossignol v. Me. Pub. Employees Ret. Sys.*, 2016 ME 115, ¶ 6, 144 A.3d 1175.

## III.      Analysis.

### A.  D.O.C. Policy 23.1 (G)(7) (2017)

It is clear that prisoners enjoy many of the protections of the Constitution, including due process protections; however, it is also clear that imprisonment carries with it the circumscription or loss of many significant rights and that these retractions are justified by the purposes underlying the penal system. *Raynes v. Dep't of Corr.*, 2010 ME 100, ¶ 13, 5 A.3d 1038; *Sandin v. Conner*, 515 U.S. 472, 485 (1995); *Hudson v. Palmer*, 468 U.S. 517, 524 (1984). In the prison context, a broad range of choices that might infringe upon constitutional rights in the general public, fall within the expected conditions of confinement of those lawfully convicted. *McKune v. Lile*, 536 U.S. 24, 36 (2002). These limitations on prisoner's rights and privileges follow, in part, from the need to grant necessary authority and capacity to federal and state officials to administer the nation's prisons. *Id.* at 37. Accordingly, the Law Court has explained that when a person is incarcerated he forfeits his liberty and "all of his personal rights except those which the law in its humanity accords to him," as a consequence of his crime. *Norris v. State*, 541 A.2d 926, 929 (Me. 1988).

In substance, Mr. Givens argues that the D.O.C. violated his due process rights under the Fifth Amendment by: 1) wrongfully classifying him as a sex-offender, without an underlying conviction, and 2) by compelling him to participate in the prison's sex-offender treatment program by making the program a prerequisite to earning certain "good-time" credits and transfer to a minimum-security facility. Mr. Givens is correct that, as a prisoner, he has protections under the Due Process Clause; however, the fact that prisoners retain rights under the Due Process Clause does not imply that those rights are not subject to necessary "restrictions imposed by the nature of the regime to which they have been lawfully committed." *French v. Butterworth*, 614 F.2d 23, 25 (1st Cir. 1980); *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). "When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Raynes v. Dep't of Corr.*, 2010 ME 100, ¶ 19, 5 A.3d 1038 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). Accordingly, a regulation may be upheld if either (1) it does not limit

7

an inmate's constitutional rights, or (2) although the regulation limits an inmate's constitutional rights, it is validly related to legitimate penological interests[4]. *Id.*

D.O.C. policy 23.1(G)(7) (2017) did not limit Mr. Givens' constitutional rights. There is no state or federal constitutional right to good-time credit. *Norris v. State*, 541 A.2d 926, 929 (Me. 1988). And nothing in federal law creates a substantive right for a state prisoner to participate in a minimum-security program. *Clark v. Comm'r of Corr.*, 512 A.2d 327, 329 (Me. 1986). Although "good-time" credits affect a prisoner's liberty by reducing the length of his imprisonment, this liberty interest does not rise to the level of a fundamental right because a prisoner has "as a consequence of his crime not only forfeited his liberty, but all of his personal rights except those which the law in its humanity accords to him." *Norris v. State*, 541 A.2d 926, 929 (Me. 1988). Furthermore, under Maine law, opportunities to earn good time credits and the deduction of earned "good-time" credit is expressly subject to the discretion of prison authorities. *See* 17-A M.R.S. § 1253(6) (2018); *See also Clark v. Comm'r of Corr.*, 512 A.2d 327, 329 (Me. 1986).

Contrary to Mr. Givens' assertions, the record indicates that he was not compelled to participate in the sex-offender treatment program but instead voluntarily chose to participate. The D.O.C.'s sex-offender treatment program is an incentive-based program; it provided Mr. Givens

---

[4] If the Court found that the regulation limited Mr. Givens' constitutional rights, it would also find that the policy was validly related to legitimate penological interests. Such interests being 1) public safety and 2) reducing the risk of the prisoner reoffending, which are set forth in Commissioner Liberty's April 26, 2019 "Response to Prisoner Grievance Third Level Appeal." When contesting the reasonableness of a prison's regulation, the prisoner bears the burden of persuasion. *Overton v. Bazzetta*, 538 U.S. 126, 132 (2003). Since "most offenders will eventually return to society a paramount objective of the corrections system is the rehabilitation of those committed to its custody." *Pell v. Procunier*, 417 U.S. 817, 823 (1974). See also *McKune v. Lile*, 536 U.S. 24, 33-36 (2002)(rehabilitating sex offenders is a vital state penological interest.) By including prisoners formally charged with a sex offense in the prisoners who are offered treatment, the D.O.C. crafted a regulation with a broad scope encouraging all prisoners who may have committed a sex offense to participate in rehabilitation. The D.O.C.'s decision to include prisoners formally charged with a sex offense in the policy is within the discretion of the D.O.C. *see e.g. Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (courts must accord "substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them.")

with an avenue to earn certain "good-time" credits and, upon completion, be considered for transfer to a minimum-security facility. He was free to refuse to participate in the treatment program and, although he would not have earned "good-time" credits through the program if he declined to participate, neither would he have lost good-time credit he had already earned. Mr. Givens had the choice to not participate in the sex-offender treatment program, but he opted for participation and earned good-time credits for that participation. In addition, Mr. Givens does not dispute that he was formally charged with a sex-offense in 2012 in Georgia. For all of these reasons, the court concludes that the D.O.C. policy did not infringe on Mr. Givens' constitutional rights as a prisoner, that the D.O.C. did not abuse its discretion when it classified Mr. Givens as someone who had been formally charged with a sex offense, and did not abuse its discretion or violate the law when it then required him to complete the D.O.C.'s sex offender treatment program before considering him for transfer to a minimum-security facility.

### 1. Equal Protection Clause

Mr. Givens' argues that the D.O.C.'s sex offender treatment policy violates his rights under the equal protection clause. The equal protection clause of the Fourteenth Amendment nullifies only State action which produces irrational, arbitrary and, therefore, invidious discrimination. *Chestnut v. State*, 524 A.2d 1216, 1220 (Me. 1987). Moreover, before a court can find an equal protection clause violation, it must at least have some indication that there exist similarly situated persons who have not been treated equally. *Id.* Based on the record presented, the court cannot find that the D.O.C. policy produced irrational, arbitrary, and invidious discrimination under the equal protection clause.

### 2. Harm Resulting from Sex-Offender Classification

Mr. Givens further asserted that because of his participation in the sex-offender rehabilitation program he has become a target for abuse by other prisoners and that his family life

has been harmed because members of his family now believe he is a sex-offender. While a stigma may attach to persons who participate in sex-offender treatment, the court reiterates that the record indicates that Mr. Givens was not compelled to participate in the sex-offender treatment program. Any consequences resulting from Mr. Givens' participation in the program flow from his own voluntary choice to participate. In addition, at the October 16, 2019 hearing, Mr. Givens stated that he was the one who disclosed his participation in the sex-offender program to members of his family, not the D.O.C.

## B. Request for Transfer to Minimum-Security Housing

Mr. Givens further grieved that the D.O.C. should transfer him to minimum security housing because he completed the sex-offender treatment program and otherwise qualified for transfer. Selection for placement in a minimum-security program depends entirely on whether, in the judgment of prison officials, a committed offender is "worthy of trust." 34-A M.R.S.A. § 3035(1) (2018); *see Clark*, 512 A.2d at 329. An inmate has no guarantee of continued placement in an education/work release program. *Clark*, 512 A.2d at 329. Pursuant to 34-A M.R.S.A. § 3061(1) (2018), the Department of Corrections may at any time transfer an inmate between institutions and from any program. In addition, nothing in federal law creates a substantive right for a state prisoner to participate in a minimum-security program. *Clark v. Comm'r of Corr.*, 512 A.2d 327, 329 (Me. 1986).

In this case, the record indicates that the D.O.C. declined to transfer Mr. Givens to a minimum-security facility because when he applied for transfer he was classified as a medium-custody prisoner. Under State of Me. D.O.C. Policy No. 23.1 (G)(7) (2017), a prerequisite for any prisoner to be considered for transfer to a minimum-security facility was a minimum custody classification. The record further indicates that the D.O.C. staff classified Mr. Givens as a medium custody prisoner at the time of his grievance because of two disciplinary violations. Given those

two disciplinary violations, the D.O.C. did not abuse its discretion when it declined to transfer Mr. Givens to a minimum-security facility.

For the reasons provided above, Mr. Givens' petition is denied and the Department of Correction's decision is affirmed.

The Clerk shall enter the following upon the docket:

Mr. Givens' petition is denied and the Department of Corrections decision is affirmed.

_11/20/19_
Date

Ann Murray, Justice
Maine Superior Court

ORDER/JUDGMENT ENTERED IN THE
COURT DOCKET ON: 11-22-19

11